UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - DETROIT

In the matter of:

Gregory James Reed,                    Case No. 14-53838-MBM
                                       Chapter 7
_____ Debtor.   /    Hon. Marci B. McIvor

## OPINION REQUIRING DEBTOR TO TURNOVER ASSETS TO THE BANKRUPTCY ESTATE

On October 7, October 15 and November 2, 2015, this Court held an evidentiary hearing on the Chapter 7 Trustee's Motion for Turnover of property of the estate. The purpose of the evidentiary hearing was to determine whether assets titled to, or in the possession of, the Keeper of the Word Foundation, Gregory Reed & Associates, PC, the Gregory J. Reed Scholarship Foundation and the Mic-Arian Corporation are, in fact, assets of Debtor's bankruptcy estate. For the reasons set forth in this Opinion, the Court holds that all of the assets of these entities are property of Gregory Reed's bankruptcy estate, except for: (1) the assets listed on the inventory setting forth the Keeper of the Word Foundation's inventory (KWF's Trial Ex. 15; Trustee's Trial Ex. 21); and (2) assets which have inconsequential value to the estate.

I.

FACTUAL BACKGROUND

In May 1975, debtor Gregory Reed (hereinafter "Reed") purchased property located at 2460 Burns Avenue, Detroit, MI (the "Burns Property") to use as his residence.

On July 5, 1975, Reed married Verladia Blount. Prior to their marriage, Reed and Blount signed a prenuptual agreement.

In 1976, Reed became a licensed attorney. He started his own law firm, Gregory Reed & Associates, P.C. (hereinafter "GRA") Mr. Reed is the sole shareholder of GRA (Transcript of Hearing dated November 2, 2015, pp. 21-22 & 52)(hereinafter 11/2/2015 Tr. at ___).

On May 13, 1986, the Gregory J. Reed Scholarship Foundation was established (hereinafter "Scholarship Foundation").

In 1986, the law offices of Charles H. Brown, P.C. and GRA incorporated the Mic-Arian Corporation. (Transcript of Hearing dated October 15, 2015, p. 62 (hereinafter 10/15/2012 Tr. at ___)). Each entity owed 50% of the stock of the Mic-Arian Corporation ((Transcript of Hearing dated October 7, 2015, pp. 28, 29)(hereinafter 10/7/2015 Tr. at ___).

At some point prior to 1987, GRA and Charles H. Brown, P.C. purchased a building located at 1201-1209 Bagley, Detroit, MI (the "Bagley Property"). On April 28, 1987, GRA and Charles H. Brown, P.C. assigned their development interests in the Bagley Property to the Mic-Arian Corporation (10/7/2015 Tr. at 44; Mic-Arian Trial Ex. 2).

On February 7, 1989, GRA, and Charles H. Brown, PC transferred their interest in the Bagley Property to the Mic-Arian Corporation, by way of a Quit Claim Deed recorded in the Wayne County Register of Deeds at Liber 24110, Page 670. (Mic-Arian Trial Ex. 3).

2

The Mic-Arian Corporation took out a mortgage on the Bagley Property to finance the acquisition and redevelopment of the parcel. (10/7/2015 Tr. at 30; 11/2/2015 Tr. at 40). Over the next twenty years, the Mic-Arian Corporation developed the Bagley Property and turned the building into offices. These offices became occupied by, among others, Charles H. Brown, P.C., GRA, KWF, and the Scholarship Foundation.

Early in the 1990's, Mr. Reed became interested in purchasing documents and writings which he believed to have historical significance. In 1992, Mr. Reed purchased papers which will be referred as the Malcolm X papers. (Adv. Pro. No. 15-4192, Complaint, Ex. 3, p. 7). The Malcolm X papers consist of an original manuscript of the autobiography of Malcolm X with editing notes by Alex Haley, and additional documents. Between 1993 and 2014, Mr. Reed acquired many other documents and artifacts which may have significant value. These items are listed in the Trustee's Motion in Limine (Docket No. 282, ¶ 10; Docket No. 244, Ex. 15).

In 1996, Reed, Norwaine Reed, and Sharon Lawson filed articles of incorporation for the "Keeper of the Word Foundation" ("KWF"). KWF was established as a non-profit corporation whose purpose was:

> To receive and administer funds for the purpose of aiding the literary educational artifacts, papers, memoirs, memorabilia exclusively for educational purposes as provided under 501(c)3 of the Internal Revenue Code and for the purpose of and to partially or fully provide educational opportunities, as well as lectures, debates, publish scholarly writings and public forums for the general public, the community and the world via of cyberspace technology, online computer services to collect and preserve records, relics, and other things of historic interest.

(Docket No. 167, Ex. 2, Articles of Incorporation). KWF has been approved as a tax qualified § 501(c)(3) corporation by the IRS. (Docket No. 167, Ex. 6, IRS Tax

Determination Letter).  KWF appears to be current in the filing of all documents required by the State of Michigan and the IRS.

On October 3, 2000, Verladia Blount filed for divorce from Reed.  A Judgment of Divorce was entered on May 16, 2003.  In the Judgment of Divorce, the court found that, pursuant to the pre-nuptial agreement, the Burns Property belonged solely to Reed.  However, the Court also determined that, because Verladia Blount contributed financially to the mortgage payments for the twenty-five years Reed and Blount were married (the property was their marital home), Blount was entitled to 50% of the equity in the Burns Property.  The court determined that the value of Blount's equity in the Burns Property was $225,000. Reed appealed this ruling.

On April 4, 2004, Reed signed a document entitled "Assignment of Estate, Keeper of the Word Foundation" (the "Assignment") (Trustee's Trial Ex. 5).  The Assignment purports to assign all of Reed's assets to KWF.  The Assignment was notarized by Brian Heard, a notary in Wayne County, Michigan, whose commission expired on January 16, 2015.  Records on file with the Michigan Secretary of State show that Mr. Heard received his commission on October 6, 2008.  (Trustee's Trial Ex. 13).

In February 2005, the Michigan Court of Appeals, in *Reed v. Reed*, 693 N.W.2d 825, 839 (Mich. Ct. App. 2005), affirmed the award of one-half of the equity in the Burns Property to Verladia Blount.  The case was remanded to the Wayne County Circuit Court for further findings consistent with the Court of Appeals opinion regarding other assets.

4

On September 27, 2005, Reed granted a mortgage on the Burns Property to the John Adams Mortgage Company. The mortgage secured repayment of a loan in the amount of $250,000. The mortgage was recorded on October 27, 2005. (Trustee's Trial Ex. 29). On January 24, 2006, Reed recorded an Adjustable Rate Rider on the 2005 mortgage. (Trustee's Trial Ex. 30) The mortgage was subsequently assigned to Bank of America. (Docket No. 126, Amended Schedule D).

On March 29, 2007, the Wayne County Circuit Court issued "Findings of Fact and Conclusions of Law on the Remand". (Adv. Proc. No. 15-4192, Dkt. No. 1, Ex.3). The circuit court's Findings of Fact were issued as a result of the Court of Appeals 2005 remand order in *Reed v. Reed, supra.* The circuit court awarded Verladia Blount an additional $5,000 as sanctionable costs against Reed. The circuit court further found that the Malcolm X papers belonged to Reed. With regards to the Malcolm X papers, the Court stated:

> The papers of Malcolm X, according to Defendant [Reed], belong to Keeper of the Word Foundation, a 501(c) corporation. The papers were purchased in 1992, but Keeper of the Word was not formed until February 27, 1996. . . Defendant [Reed] never established, to this court's satisfaction, any transfer of ownership of the artifacts from Defendant to the 501(c), which was formed four years after the papers were purchased. However, Plaintiff [Blount] never established by a preponderance of the evidence that she contributed to the acquisition or maintenance of the collection. Therefore, pursuant to the Court of Appeals' ruling, the papers are solely Defendant's separate property.

(Adv. Proc. No. 15-4192, Dkt. No. 1, Ex. 3 at 7). There is nothing in the Court's record to show that the Wayne County Circuit Court's Findings of Fact and Conclusions of Law were reversed on appeal.

5

On April 4, 2007, Verladia Blount recorded a Claim of Interest against the Burns Property in the amount of $225,000. (Trustee's Trial Ex. 26).

In 2007, the Scholarship Foundation leased a 2007 Lexus automobile for 36 months. Mr. Reed was the guarantor of the lease. (Adv. Pro. 15-4192, Docket No. 1, Ex. 7; 10/7/2015 Tr. at 165-166; 11/2/15 Tr. at 25).

On March 17, 2008, the Wayne County Circuit Court issued a Final Judgment in *Reed v. Reed*, Wayne County Circuit Court Case No. 00-032452. The Final Judgment provided that Verladia Blount was due a separate monetary award in the amount of $225,000. (Trustee's Trial Ex. 8).

On January 2, 2010, KWF hired Reed as a consultant. His duties were to:

a)  Manage the Foundation, and caretaker of the property [sic],

b)  Market and acquire artifacts on behalf of the Foundation from Alex Haley Foundation,

c)  Curate and exhibit artifacts and documents regularly to further humanity,

d)  Complete the Foundation's arrangement with Michigan State University and other institutions,

e)  Negotiate arrangements with Institutions,

f)  Advise the board, from time to time, of needed matters,

g)  Consultant shall set his own hours as needed.

(Docket No. 167, Ex. 2, Consultant Agreement, ¶ 3). As compensation for his duties as a consultant to KWF, Reed was to receive $1,500 per month and a vehicle. (Docket No. 167, Ex. 2, Consultant Agreement, ¶ 4).

In 2010, the lease on the Lexus expired, and the Scholarship Foundation financed the purchase of the Lexus. The application for financing was signed by Reed.

6

(Adv. Pro. 15-4192, Docket No. 1, Exhibit 7). KWF then leased the Lexus from the Scholarship Foundation. (10/15/2015 Tr. at 114; 11/2/2015 Tr. at 26-27). KWF makes payments on the Lexus directly to the financing company. (11/2/2015 Tr. at 47). The Lexus is currently worth about $7,000. (11/2/2015 Tr. at 47-48). Reed is currently driving the Lexus. (11/2/2015 Tr. at 90).

By 2011, the Mic-Arian Corporation had paid off the mortgage and all construction liens against the Bagley Property. On March 17, 2011, the Mic- Arian Corporation executed a Quit Claim Deed transferring the Bagley Property to the Charles H. Brown Trust and to KWF, as tenants in common. The Quit Claim Deed was recorded with the Wayne County Register of Deeds on March 18, 2011. (Mic-Arian Trial Ex 5). After the Bagley Property was transferred, all the expenses related to the Bagley Property (property taxes, insurance, utilities) were split evenly between the Charles H. Brown Trust and KWF or Reed. (11/2/2015 Tr. at 57).

At some point before March 12, 2012, KWF also opened a savings account at First Independence Bank (account number ending in 7854). (KWF Trial Ex. 1, Doc. 195-5).

On March 1, 2012, KWF borrowed $110,000 from an entity known as Infinity Group a/k/a Infinity Progress, LLC. (10/15/15 Tr. at 136). The promissory note was signed by Reed. (KWF Trial Ex. 1, Doc.195-8, p.1). Infinity Progress, LLC was formed on January 17, 2012. Reed is its resident agent and the registered office address is the Bagley Property. (11/15/15 Tr. at 12). To secure repayment of the loan, KWF granted the Infinity Group a mortgage on the Burns Property. (10/15/15 Tr. at 16-18). The

7

mortgage is also signed by Reed. The mortgage was recorded on August 31, 2015, three days after Reed filed for bankruptcy. (Docket No. 244, Exhibit 1).

In 2012 and 2013, Reed took the property taxes paid on the Burns Property as a deduction on his federal income tax returns. (Trustee's Trial Exhibits 34, 35; 11/2/2015 Tr. at 81-82).

As of May 2013, KWF had a business checking account at First Independence Bank (account number ending in 5526). (KWF's Trial Exhibit 1, Doc. 195-1 through 195-3). Reed was the authorized signatory on the account from May 2013 through November 2014. Reed's social security checks were deposited into this account from May 12, 2014 to August 27, 2014.[1] (Docket No. 53, Exhibits; 10/15/15 Tr. at 118). From at least May 2013 through February 2015, the mortgage payments on the Burns Property were paid out of this account. From May 2013 through February 2015, this account was also used to pay Reed's credit cards, utilities (DTE) and insurance.[2] (KWF's Trial Ex. 1, Doc. 195-1 through Doc. 195-3). Payments on the Lexus were made out of this account in March, July, September, October and December of 2014. (KWF's Trial Ex. 1, Doc. 195-2).

On August 2, 2013, a deposit was made into the KWF checking account ending in 5526 by way of a wire transfer from Glen Horowitz Bookseller, Inc. in the amount of $15,000. (KWF's Trial Ex. 1, Doc. 195-1, Bank Statement Ending August 30, 2013).

_____

[1]Reed claims that his social security checks were deposited in this account in error.

[2]The only bank statements offered into evidence for the KWF checking account ending in 5526 were for the months May 2013 through March 2015. It is unclear when the KWF checking account was opened.

The money was paid into the KWF account as consideration for the sale of books, "probably for Rosa Parks' books". (10/7/2015 Tr. at 111). These funds were used, in part, to make the mortgage payments on the Burns Property in the amount of $2,672.45, a payment to American Express in the amount of $175.00, and utility payments to DTE and Consumer's Power (KWF's Trial Ex. 1, Document 195-1, Bank Statement ending August 30, 2013).

On August 26, 2013, KWF recorded a Claim of Interest in the Burns Property based on the April 4, 2004 Assignment of Reed's interest in real and personal property. (Trustee's Trial Ex. 27).

From an operations perspective, there is no evidence that KWF ever generated consistent or significant income. Its sole source of income appears to be payments received on the contracts for lectures by Reed or for the sale of copies of a book called Quiet Strength. Between 2012 and 2015, KWF entered into fourteen contracts: eight contracts in 2012, three contracts in 2013, one contract in 2014, and two contracts in 2015. (KWF Trial Ex. 1, Doc. 195-7). Payments from these contracts were deposited into the KWF checking account and used to pay Reed's personal expenses, including mortgage and credit card payments.[3] (KWF Trial Ex. 1, Doc. 195-1 through 195-3).

_____

[3]On June 12, 2013, KWF billed Troy State University for fifty copies of Quiet Strength. The bill was for $538.00. (KWF Trial Ex. 1, Doc. 195-8, pp. 11-14). A deposit of $538.00 was made into the KWF checking account on July 2, 2014. The July 2013 bank statement shows that funds were used to pay the mortgage on the Burns Property. (KWF Trial Ex. 1, Doc. 195-1, p.12). Similarly, on April 29, 2014, KWF billed Troy University $486.70 for fifty copies of Quiet Strength. (KWF Trial Ex. 1, Doc. 195-7, pp. 10-18). A deposit in this amount was made into the KWF checking account on May 30, 2014. The May 2014 bank statement shows that the account was used to pay the mortgage payment on the Burns Property. (KWF Trial Ex. 1, Doc. 195-2, p. 11).

9

The amount paid on these contracts was small, ranging from a few hundred dollars to five-thousand dollars.

Between 2007 and 2013, Verladia Blount continued to try and collect the $230,000 owed to her pursuant to the Judgment of Divorce. Ms. Blount eventually requested that the Wayne County Circuit Court appoint a receiver to liquidate Reed's assets for the benefit of his creditors. The request was granted and on September 6, 2013, David Findling was appointed Receiver over Reed's assets.

In March 2014, KWF sold a letter written by Dr. Martin Luther King, Jr. to Rosa Parks to an entity named Memorabilia, Inc. for $65,000 (10/15/2015 Tr. at 108-110; KWF Trial Ex. 16). Payment for the letter was deposited into KWF's checking account on March 31, 2014 (account ending in 5526). (KWF Trial Ex. 1, Doc. 195-2, p. 7 of 22). From March 2014 to January 2015, the funds from that sale were used to pay Reed's personal expenses including the mortgage on the Burns Property ($2,351.50 per month), DTE Energy, Comcast Cable, and various credit cards including American Express and Visa and car payments for the Lexus. (KWF's Ex. 1, Doc. 195-2 and Doc. 195-3).

On July 2, 2014, Reed opened a personal checking account at First Independence Bank (account number ending in 9895) with a deposit of $50.00. (Docket No. 53, Exhibits).

On August 28, 2014, Reed filed a voluntary petition under Chapter 7 of the Bankruptcy Code. His schedules were filed on September 10, 2014. Schedule A lists the Burns property valued at $200,000 with a mortgage of $250,000. Schedule B lists cash in bank accounts totaling $300, and $2,000 in accrued social security benefits.

10

Schedule C exempts both the cash and the accrued social security benefits.  Schedule D lists the $250,000 mortgage on the Burns property (owed to MERS as servicer for Bank of America). Schedule F listed total unsecured debt in the amount of $597,153.02 and includes a "disputed" obligation to Verladia Blount in the amount of $230,000. Schedule I lists income of $1,500 per month plus $2,000 per month social security income.  Schedule J lists a monthly mortgage payment of $2,530 and miscellaneous other monthly expenses totaling $988.

On September 21, 2014, Reed filed his First Amended Schedules to add a timeshare unit in Harbor Springs, MI.  Mr. Reed asserts an interest in the time share property even though the Hideaway Valley Condominium Owners' Association foreclosed upon the unit in March, 2012 for unpaid dues and assessments in the amount of $20,850.74. (Trustee's Trial Ex. 31, 32).

On September 29, 2014, Reed filed his Second Amended Schedules to add "social security benefits in the Receiver David M. Findling, Attorney at Law."

On September 30, 2014, Reed was sued by Barlan Enterprises, Ltd (hereinafter "Barlan") in the New York state court. (See, Adv. Case. No. 15-4192, Docket No. 4, Ex. 1).   Barlan, which owns a general auction business operating under the name of "Guernsey's,"  sought a declaratory ruling that Reed was not entitled to a commission arising out of a contract entered into by Barlan and Reed in 2005.  On October 15, 2014, Barlan and Reed settled the matter for $70,000.  The settlement agreement provided that the proceeds of the settlement were to be deposited in a KWF account at First Independence Bank. The agreement was signed by Reed and Arlan Ettinger on behalf of Barlan. (Trustee's Trial Exhibit 10).  The settlement proceeds were

subsequently deposited into a savings account belonging to KWF (account ending in 7854). (KWF's Trial Ex. 1, Doc 195-6, p.17).[4]

On November 13, 2014, Reed withdrew $65,012 from KWF's savings account (account ending in 7854). (KWF's Trial Ex. 1, Doc. 195-6, p. 16-17 of 20). Reed paid $12.00 in costs and used the remaining $65,000 to purchase three cashiers checks totaling $64,500. (Trustee's Trial Ex.s 3, 4). The funds were ultimately utilized to pay $51,200 to the Infinity Group, $3000 to Glen Horowitz and $800 to Bobby Frierson. (*Id.*) The rest of the money was either spent by Reed or redeposited in KWF account.(Adv. Pro. 15-4192, Docket No. 4, Ex. 5-8).

In November, 2014, Reed resigned from the Board of Directors of KWF. (10/7/2015 Tr. at 119). However, he retained check signing authority on KWF's bank accounts. Between November 14, 2014 and January 28, 2015, Reed signed nineteen checks drawn from KWF bank accounts. (KWF Trial Ex. 1, Document 195-5, pp. 12-16). One of the checks was to *Reed's* attorney, Carolyn Jackson. It is unclear from the

---

[4]The Settlement Agreement provided, in part:

In exchange for the promises made herein, this matter is settled for the sum of Seventy Thousand Dollars ($70,000.00) in full satisfaction of all claims. Payment shall be made by wire transfer to Assignee's designated account for full payment as to Defendants within two business days of receipt of a hard copy of the executed and notarized Agreement by Defendant Reed, individually and on behalf of the assignee and a hard copy of an executed W-9. Defendant approved account; Account No (XXXX), Account holder: KWF FOUNDATION, Routing No. XXXX, FIND Bank of Detroit, 44 Michigan Ave, Detroit, MI 48226. Guernsey's shall have no liability as to any complaint regarding the division of funds, its sole obligation being to deposit the funds to the designated account.

face of the other checks what services KWF was receiving in exchange for the payments.

On November 24, 2014, Verladia Blount filed an adversary proceeding against Reed (Adv. No. 14-5225). Blount's adversary proceeding is an action under 11 U.S.C. §§ 727(a)(2),(3),(4) and (5) based on Defendant's lack of transparency and unwillingness to come forward with requested discovery regarding his assets.

On December 15, 2014, Reed deposited a $4,000 check made payable to KWF into his personal account at First Independence Bank, ending in 9895 (See, Adv. Case No. 15-4192, Docket No. 4, Ex. G, Deposit Slip). Reed endorsed the check.

In February 2015, the Chapter 7 Trustee became aware of Reed's post-petition settlement with Barlan. The Trustee immediately filed an adversary proceeding (Adv. Pro. No. 15-4192) against Reed, KWF, Sharon Lawson, Charles H. Brown, Charles H. Brown Trust, GRA, the Scholarship Foundation, and the Mic-Arian Corporation. The Complaint alleges that the Defendants are the recipients of fraudulent transfers and co-conspirators in bankruptcy fraud. As part of the adversary proceeding, the Trustee sought a temporary restraining order to prevent the recipients of the money from the Barlan settlement from spending the proceeds until it was ascertained whether the funds were property of the bankruptcy estate.

On March 4, 2015, this Court entered an order which enjoined KWF, GRA, the Scholarship Foundation and Mic-Arian Corporation from transferring or spending the following assets pending further order of the Court:

1.  Cashiers check in the amount of $51,200 dated November 21, 2014, payable to the Infinity Group and issued by First Independence Bank of Michigan;

2.      Real property located and 1201/1209 Bagley, Detroit, Michigan;

3.      2007 Lexus GX470, VIN JTJBT20XX70134915

(Adv. Case No. 15-4192, Docket No.12, Temporary Restraining Order).

On June 15, 2015, the Trustee filed a Motion to Turnover Property. The Trustee claims that the Motion for Turnover was necessitated by Mr. Reed's lack of candor regarding his income and his assets. Specifically, the Trustee believes that Reed's Schedules are not an accurate picture of his financial affairs. The Trustee alleges that numerous assets, including but not limited to bank accounts, the Bagley Property, miscellaneous documents, and Reed's interest in GRA, the Scholarship Foundation, and the Mic-Arian Corporation are property of the bankruptcy estate.

The Court held a hearing on the Trustee's Motion for Turnover on July 21, 2015. At the conclusion of the hearing, the Court issued a preliminary ruling holding that there were already pleadings in the record from which the Court could conclude that the Burns Property, the Malcolm X papers, and the Barlan's settlement received by Reed post-petition were property of the bankruptcy estate. The Court scheduled an evidentiary hearing regarding the issue of whether any of the assets held by KWF, or allegedly held by KWF, were property of the bankruptcy estate. The evidentiary hearing was also for the purpose of determining whether there was any value in any other entity in which Reed had an interest. The evidentiary hearing was scheduled for October 7, 2015.

On September 18, 2015, Reed, the Trustee and KWF stipulated to the entry of an Order regarding discovery. That Order provided, in relevant part:

14

IT IS FURTHER ORDERED THAT on September 18, 2015, at 9:00 A.M. at 1201 Bagley, Detroit, Michigan 48226, the KEEPER OF THE WORD FOUNDATION will produce to the Trustee any and all books and records of KEEPER OF THE WORD FOUNDATION for the purpose of their examination by the Trustee, AND,

IT IS FURTHER ORDERED THAT on September 18, 2015, at 9:00 A.M. at 1201 Bagley, Detroit, Michigan 48226, **the KEEPER OF THE WORD FOUNDATION will produce to the Trustee any and all assets of KEEPER OF THE WORD FOUNDATION** for the purpose of being reviewed and inventoried by the Trustee, AND,

IT IS FURTHER ORDERED THAT to the extent an asset is no longer in possession of KEEPER OF THE WORD FOUNDATION, it must provide to the Trustee a verified statement setting forth the details of each of said asset's disposition, and produce all supporting documents evidencing its disposition.

(emphasis added).

On September 18, 2015, the Trustee took an inventory of the assets of KWF.

That Inventory is as follows:

1. Stack No. 1 - Book reports and student research
2. Stack No. 4 - Children's letters, birthday cards to Rosa Parks
3. Stack No. 5 - Letters to Barack Obama from children
4. Stack No. 7 - All photos (copies), articles and documents regarding a buffalo soldier, Life magazine
5. Photo 1939 25th infantry unit photo
6. Black box - MSU Alumni magazine, and front page magazine
7. Stack 10 - Progressive clergy red pope under Gregory J. Reed Scholarship Foundation, correspondence seminar information, unmailed marketing materials
8. Envelope - [sic] letters to KWF from Detroit Day School for the Deaf - T- shirt contest
9. Stack No. 12 - letters from school children at Farmington High School - Global lessons Mrs. Park and Mr. Mandela Exhibition, 2009 newspapers
10. Documents and Red Pope - Curriculum on the Wall - American History
    - letters to President Obama from school children
    -Articles regarding exhibits
    -Dear President Obama writing contest for KWF, letters from school children

15

11. Stack 15
   -series of student letters cut out to look like a T-shirt
   -Releases from children and their photos authorizing the use of their image
   - Photocopies of articles
   - Print out of articles
12. Stack No. 16 - letters to President Obama with typed form response (no signatures)(not original)
13. Exhibit Placard - Malcolm X Exhibit of manuscript and W.D. Ford letter
14. Envelope - KWF corporate documents
   - IRS correspondence re: application for non-profit status
   - By-laws
   - Documents related to the purchase of the Malcolm X papers
15. Basement
   - Miscellaneous book projects

The following statement appears at the bottom of the handwritten inventory:

> The foregoing is a listing of the assets produced for examination by the Trustee for Keeper of the Word Foundation. This inventory was produced in accord with the Court's order of 9/18/15.

(Trustee's Trial Exhibit 22).

On October 7, 2015, this Court issued a "Judgment of Default and Denial of Discharge" in *Blount v. Reed*, Adv. Pro. No. 14-5225. The Default Judgment was entered because Reed failed to respond to requests for discovery. This Default Judgment denied Reed his discharge pursuant to 11 U.S.C. §§ 727(a)(2), (3), (4)(A) and (5).

On October 7, 2015, a hearing was held on the Trustee's Motion for Turnover. The hearing was continued on October 15, 2015 and on November 2, 2015. Three witnesses testified at the evidentiary hearing: Charles Brown, Sharon Lawson, and Reed.

On October 10, 2015, the Trustee filed a motion seeking a temporary restraining order. The Trustee's motion alleged that Reed had documents and memorabilia at the

Burns Property, which Reed had never disclosed either on his Schedules or as part of the inventory of the assets of KWF. On October 15, 2015, Reed and his counsel agreed to allow the Trustee to inventory the contents of the Burns Property (10/15/2015 Tr. at 179-181).

On October 19, 2015, the Trustee conducted an inspection of the Burns Property. The home has approximately fifteen rooms and a two-car garage. During the course of this inspection, the Trustee found original artwork, artifacts, antiques, autographed books, a baby grand piano, and museum display items. The garage held six large wooden shipping crates sent to Reed from the DuSable Museum in Chicago. The shipping crates contained framed museum exhibits, including gold records from Motown artists, autographed photographs, and many original documents relating to Motown artists. None of the items discovered in the inspection of the Burns Property were listed on Reed's Schedule B (Personal Property) nor were they included in KWF Inventory prepared on September 18, 2015.

On November 10, 2015, Court entered a temporary restraining order, the terms of which had been stipulated to by the parties. That order provided, in relevant part:

> IT IS FURTHER HEREBY ORDERED that on October 19, 2015, the Trustee, through his counsel, inspected the personal property at Burns (the "Burns Personal Property").
>
> IT IS FURTHER HEREBY ORDERED that the Burns Personal Property which was located at Burns on October 19, 2015, regardless of title or ownership, is restrained and enjoined. The Debtor, Gregory Reed, any entity in which the Debtor has an interest, their agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them or having obtained notice of the entry of this order, are prohibited from alienating, conveying, assigning, leasing, loaning, mortgaging, modifying, destroying, disposing, concealing, secreting, selling, liquidating, removing, transferring (including transfer on

17

behalf itself or to any other person as trustee, guardian or nominee), releasing, moving or causing the removal or transfer, conveyance, destruction, alienation, lease, modification, mortgage, borrowing upon or other disposal of or encumbrance of any of the Burns Personal Property, without the prior order of this Court.

The specific items subject to the November 10, 2015 Order are listed in the Trustee's Motion in Limine (Docket No. 282).

On October 28, 2015, Reed filed a Motion to Compel the Trustee to abandon the Burns Property on the grounds that the property is of inconsequential value to the estate. Reed's Motion requested an order requiring the Trustee to abandon the Burns Property to him and/or his assignee, KWF. On November 24, 2015, this Court entered an order denying Reed's Motion. The Court held that the Burns Property is property of the estate with sufficient value to provide a benefit to the estate upon liquidation of the property. On November 30, 3015, Reed filed a Notice of Appeal of this Court's November 24, 2015 Order.

II.

ANALYSIS

The matter before this Court is the Trustee's Motion for Turnover. Section 542 of the Bankruptcy Code requires that a debtor turnover property of the estate to the trustee, unless it is of inconsequential value. 11 U.S.C. § 542 states:

(A) Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian in possession, custody, or control, during the

18

case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

The purpose of section 542 of the Bankruptcy Code is "to expand the trustee's power to 'bring into the estate property in which the debtor did not have a possessory interest at the time the bankruptcy proceedings commenced', ensuring that a broad range of property is included in the estate in order to promote the congressional goal of encouraging reorganization." *Braunstein v. McCabe,* 571 F.3d 108, 116 (1st Cir. 2009) *quoting United States v. Whiting Pools, Inc.,* 462 U.S. 198, 205, 207-08 (1983).

Section 542(a) provides that an entity in control of property that a trustee may use, sell or lease under § 363, or that a debtor may exempt under § 522, shall deliver that property to the trustee, unless the property is of inconsequential value or benefit to the estate. *TranSouth Fin. Corp. v. Sharon (In re Sharon)*, 234 B.R. 676, 689 (B.A.P. 6th Cir. 1999). "[F]undamental to the concept of 'Turnover' is that the asset to be turned over must be property of the debtor's bankruptcy estate." *Laurence v. Kentucky (In re Shelbyville Rd. Shoppes, LLC)*, 775 F3d 789, 793 (6th Cir. 2015).

A claim for turnover under § 542 requires that the trustee prove that the property to be turned over is property of the debtor's bankruptcy estate. *See United States v. Chalmers (In re Wheeler)*, 252 B.R. 420, 425 (W.D. Mich. 2000) ("[F]undamental to the concept of turnover under § 542(a) is that the asset to be turned over must be property of the debtor's bankruptcy estate as defined by the Bankruptcy Code."); *Alofs Mfg. Co. v. Toyota Mfg., Ky., Inc. (In re Alofs Mfg.)*, 209 B.R. 83, 89-91 (Bankr. W.D. Mich. 1997)("It is well established that the burden of proof is on the party seeking turnover of

19

property of the estate[.]).  Mere allegations by a trustee are insufficient; specific evidence is required.  *Corcoran v. Publow*, 418 B.R. 231, 235 (E.D. Mich. 2009).

A party seeking turnover under § 542 must establish: (1) that the property is or was in the possession, custody or control of an entity during the pendency of the case; (2) that the property may be used by the trustee in accordance with § 363 or exempted by debtor under § 522; and (3) that the property has more than inconsequential value or benefit to the estate. *Bailey v. Suhar (In re Bailey),* 380 B.R. 486, 490 (B.A.P. 6th Cir. 2008). It is "well established that turnover is appropriate when (1) the money or property directed to be turned over is part of the bankruptcy's estate, and (2) the bankrupt or person ordered to turn over the property has it in his possession or under his control at the time of the order." *Camall Co. v. Steadfast Ins. Co. (In re Camall Co.)*, 16 Fed. Appx. 403, 406 (6th Cir. 2001); *See also, Collins & Aikman Corp. v. Northern Trust Bank of Cal, NA (In re Collins & Aikman Corp.),* 2006 WL 2310798 (Bankr. E.D. Mich); *In re Wheeler*, 252 B.R. at 425.

Generally, a motion for turnover brought pursuant to 11 U.S.C. § 542 is brought when a trustee discovers that an asset owned by a debtor is in the possession of a third party.  The turnover motion is the legal mechanism by which the trustee recovers the property for the benefit of the bankruptcy estate.  The debtor plays no role in a turnover action.  To the extent there is a dispute, it is a dispute between the trustee and the third party.

The Motion for Turnover in the instant case is in a different posture.  During the course of this bankruptcy, the Trustee became aware that Reed had income and property interests that were not accurately represented on his bankruptcy schedules.

20

Specifically, (1) Reed's income went into, and his expenses were paid out of, a bank account in the name of KWF, and (2) Reed failed to list several entities in which he had an interest on Schedule B of his bankruptcy schedules.  When the Trustee attempted to obtain an accurate picture of Reed's financial affairs, both Reed and KWF took the position that Reed had assigned all his interest in both real and personal property to KWF and, therefore, Reed had no assets which could be administered by the Trustee. The Trustee, frustrated by his inability to obtain an accurate picture of Reed's financial affairs, filed the instant Motion for Turnover, seeking to recover assets transferred, or allegedly transferred to KWF, for the benefit of Reed's bankruptcy estate.

After reviewing the entire record in this case, this Court has determined that it cannot rule on the Motion for Turnover without first addressing a purely legal issue, that being the legal effect of the 2004 Assignment.  As noted above, Reed and KWF have both taken the position that Reed transferred all his assets, including the Burns Property, to KWF by way of the 2004 Assignment. (10/15/15 Tr. at 63-70).  Reed and KWF assert that, as a result of the 2004 Assignment, Reed owns no assets which may be administered by the Trustee.  (11/2/15 Tr. at 90).  The Court must determine whether the Assignment of Reed's interest in his property to KWF transferred ownership of property so as to preclude Reed's creditors from recovering property for payment of Reed's obligations.

A.  <u>ASSETS ALLEGEDLY ASSIGNED BY GREGORY REED</u>

The assignment relied upon by Reed and KWF is dated April 4, 2004[5] and signed

by Reed, as assignor, and by Sharon Lawson (Reed's sister) and Bertha Montgomery

(Reed's mother), as witnesses.  The assignment states in relevant part:

> GREGORY J. REED, (hereinafter called "Assignor") for good and valuable consideration, from KEEPER OF THE WORD FOUNDATION, duly organized under the laws of Michigan (Hereinafter called "Assignee"), the receipt whereof is hereby acknowledged, does hereby grant, convey, irrevocably assign and set over unto Assignee, its successors and assigns, on an exclusive basis all of his right, title and interest wherever situated in real and personal property items; household furnishings, artifacts, artworks, furniture, rugs, piano, books, music related items, all of the personal assets, papers, properties, contracts, rights and obligations relating thereto, including without limitations, copyrights and renewals for the purposes of estate liquidation and donation of selected items to institutions such as Michigan State university, Universities of Michigan, Harvard, Emory, Howard, etc, by the Assignee, foundation, to support the purpose of the Assignee, foundation, and perpetuate its mission and purpose for all territories of the world in perpetuity.
>
> Assignor hereby covenants with Assignee that Assignor is the sole lawful owner of real and personal items where situated and assets, rights described above defined to be the Reed Estate, personal and real, hereof as real and personal property items; household furnishings, artifacts, papers, contracts and rights relating thereto and of the above described artifacts, documents writings, contracts and rights relating thereto as described in this Assignment, but not limited hereto; and that he has the right to transfer the items to the Assignee.

Reed testified at the evidentiary hearing on the Motion for Turnover, that the purpose of

the assignment was estate planning. (11/2/15 Tr. at 76).

---

[5]It is unclear whether the document was actually signed on this date.  While the assignment is notarized, the notary stamp shows an expiration date of 1/16/2015. Records filed with the State of Michigan show that the notary, Brian Heard, received his notary commission on October 6, 2008.  Since Mr. Heard received his commission more than four years after the assignment was allegedly signed, Mr. Heard could not have legally notarized the assignment.

This Court finds that the Assignment is ambiguous in that it provides no specifics regarding either the timing of the Assignment or specific assets to be assigned. There are no other documents (trust documents, deeds, a will, an inventory of items assigned) to resolve this ambiguity. Issues regarding property interests are resolved by looking to state law. *Butner v. U.S.*, 440 U.S. 48 (1979). As a matter of state law, an assignment is only valid if the assets which have been assigned are transferred to, and in the possession of, the assignee and if the assignor relinquishes control over those assets. *Burkhardt v. Bailey*, 680 N.W.2d 453 (Mich. Ct. App. 2004)*; Brown Bark, II, LP v. Bay Area Floorcovering & Design, Inc.*, 2011 WL 2140368, *1 (Mich. Ct. App.); *Affiliated Worldwide, LLC v. Vanderburg*, 2009 WL 1443164, *4 (Mich. Ct. App.). The court in *Burkhardt* summarizes Michigan law regarding assignments:

> There is little case law in this state regarding what elements are necessary to create an assignment. In *Weston v. Dowty*, 163 Mich.App. 238, 242, 414 N.W.2d 165 (1987), this Court opined "there must be a perfected transaction between the parties which is intended to vest in the assignee a present right in the thing assigned." Further, Michigan's version of the statute of frauds requires that an assignment of "things in action" be "in writing and signed with an authorized signature by the party to be charged with the agreement, contract, or promise...." M.C.L.Â. § 566.132(1)(f). Thus, under Michigan law, a written instrument, even if poorly drafted, creates an assignment if it clearly reflects the intent of the assignor to presently transfer "the thing" to the assignee. *Hovey v. Grand Trunk W. R. Co.*, 135 Mich. 147, 149, 97 N.W. 398 (1903).
>
> Foreign jurisdictions have also held generally that an assignment requires an assignor's intent to presently assign be clearly manifested. "No 'particular form of words is required for an assignment, but the assignor must manifest an intent to transfer and must not retain any control or any power of revocation.'" *Travertine Corp. v. Lexington-Silverwood*, 670 N.W.2d 444, 447 (Minn. App., 2003), quoting *Minnesota Mut. Life Ins. Co. v. Anderson*, 504 N.W.2d 284, 286 (Minn .App., 1993). See, also, *E & L Rental Equip., Inc. v. Gifford*, 744 N.E.2d 1007, 1011 (Ind .App., 2001), quoting *Brown v. Indiana Nat'l Bank*, 476 N.E.2d 888, 894 (Ind.App., 1985): "'In determining whether an assignment has been made, the

23

question is one of intent. A written agreement assigning a subject matter must manifest the assignor's intent to transfer the subject matter clearly and unconditionally to the assignee.'" (Citations omitted.)

*Burkhardt,* 680 N.W.2d at 463. See also, *Bay Area Floorcovering & Design, Inc.*, 2011 WL 2140368 at *1 (the assignor must not retain any control or any power of revocation over the asset assigned); *Affiliated Worldwide*, 2009 WL 1443164 at *4 ("the assignor must simply manifest an intent to transfer and must not retain any control or any power of revocation."). *See also*, *In re Ashford,* 73 B.R. 37 (Bankr. N.D. Texas 1987)("[t]he transfer must be such as to leave the assignor with no control over the fund").

Reed has never transferred any of the assets listed in the Assignment or relinquished control over those assets. With respect to the Burns Property, Reed has lived at the Burns property continuously since 1975. Reed never transferred title of the Burns property to KWF. On September 27, 2005, 17 months after the assignment was purportedly signed, Reed borrowed $250,000 from the John Adams Mortgage Company and granted a mortgage on the Burns property to secure repayment of the loan. In 2012 and 2013, Reed took the property taxes paid on the Burns Property as a deduction on his federal income tax returns. Reed also listed the Burns Property on Schedule A and exempted his interest in the Property on Schedule C. As recently as October 28, 2015, Reed argued that the estate's interest in the Burns Property should be abandoned to him. There is not a shred of evidence, other than the self serving assignment, to support Reed and KWF's argument that the Burns property is an asset of KWF rather than an asset of Reed's bankruptcy estate.

Reed has also never delivered or relinquished control of the personal property allegedly "assigned" to KWF. As part of the inspection conducted by the Trustee on

24

October 19, 2015, the Trustee found original art work, artifacts, antiques, autographed books, a baby grand piano and six large shipping crates sent to Reed from the Dusable Museum in Chicago. The shipping crates held framed museum exhibits which may have significant value. It is unclear whether these items were acquired by Reed before of after the assignment was executed. However, the date of acquisition is immaterial. The facts demonstrate that Reed has always maintained control of the memorabilia he has collected over the years, and has used it to generate revenue for himself, not for the benefit of KWF.

The facts demonstrating that Reed never actually "assigned" any personal property to KWF are as follows. First, Reed hid those assets from the Chapter 7 Trustee. Pursuant to a Court Order dated September 18, 2015, KWF was required to produce all of its assets for inspection and for purposes of creating an inventory. None of the property found by the Trustee at the Burns Property was made available to the Trustee on September 18, 2015. Reed's only explanation as to why the assets stored at the Burns Property were not stored at the offices of KWF was that the property was "in threat of damage." When asked what the alleged damage was to the property, Reed responded "the Trustee." (11/2/15 Tr. at 94).

Second, in addition to hiding assets allegedly transferred to KWF, Reed has sold assets allegedly belonging to KWF and paid his personal expenses with the proceeds of those sales. Specifically, in August 2013, Reed sold book(s) to Glen Horowitz Bookseller, Inc. for $15,000. The money was deposited by a wire transfer in KWF checking account and subsequently used to pay Reed's personal expenses. In March, 2014, Reed sold a letter from Martin Luther King to Rosa Parks to Memorabilia, Inc. for

$65,000.00. Reed testified that the letter came from the "inventory of Keeper of the Word Foundation." (10/15/15 Tr. at 109). The check was deposited in KWF's checking account (account ending in 5526) on March 31, 2014. Subsequent bank statements for the months April, 2014 through March, 2015 demonstrate that those funds were used to pay Mr. Reed's personal expenses, specifically his mortgage, his car payment, his utility bills and his credit card bills. Lastly, payments for the sale of books by KWF were deposited into a KWF bank account and then used to pay personal expenses.

It is certainly possible that Reed intends that the Burns Property and the documents and memorabilia he has collected over the last thirty years pass to KWF upon his death. While he is alive however, Reed uses both the Burns Property and the personal property stored at the Burns Property for his own personal benefit.[6] Reed may also have personal property of value that is in the possession of a third party. The Malcolm X Papers, which were awarded to Mr. Reed in the Judgment of Divorce, have yet to be produced. Since Reed continues to control the use of his personal property, the Court finds that the 2004 "Assignment" did not transfer ownership of either the Burns Property or any personal property not explicitly memorialized by the inventory dated September 18, 2015 from Reed to KWF.


B. ASSETS BELONGING TO KWF

---

[6]Reed has also alleged that he assigned his interest in the timeshare condominium in Harbor Springs, MI to KWF. It is unclear whether Reed has any interest in the Harbor Springs timeshare since the property was foreclosed upon on March 29, 2012. To the extent Reed has any interest in the real property, or in the personal property formerly located at the timeshare, that interest belongs to the bankruptcy estate.

The next issue before the Court is whether real and personal property in the possession of, or titled to, KWF is property of Reed's bankruptcy estate. The Trustee and KWF have agreed on what property constitutes the personal property possessed by KWF. (Trustee's Trial Ex. 21). The parties also agree that the Bagley Property is titled in the name of the Charles Brown Trust and KWF. Notwithstanding the fact that those assets are in the possession of, or titled in the name of KWF, it is the Trustee's position that the assets of KWF are property of Reed's bankruptcy estate. The Trustee argues that Reed has used KWF for his own financial gain, and therefore the assets titled in KWF's name must be treated as assets of Reed's bankruptcy estate. The Court agrees.

KWF was established in 1996 as a non-profit corporation whose purpose was to obtain documents, artifacts and memorabilia and to preserve those items for display. KWF was also established to fund lectures and debates and to publish scholarly writings. KWF is a tax qualified § 501(c)(3) corporation and is current on filing all documents required by the State of Michigan and the IRS necessary to maintain its tax exempt status.

The evidence supports the conclusion that KWF has always engaged in *some* activity consistent with its stated purpose. The evidence is even stronger, however, that Reed has used KWF primarily to protect his income and assets from the claims of creditors. Since at least 2012, Reed has had sole control over the financial affairs of KWF (10/7/2015 Tr. at 118-120; KWF's Trial Ex. 1, Doc. 195-1 through Doc. 197-7). He used that control for his own benefit. He used the KWF bank account to pay all, or most of, his personal expenses, including the mortgage on the Burns Property, utilities, credit

27

cards, and the Lexus car payment. His social security income was deposited into the KWF accounts. Reed used KWF to sell personal property and then retained the benefits of the transactions for himself.

Reed also used KWF for purposes which have nothing to do with the charitable and educational mission of KWF. There are two transactions which demonstrate that Reed used KWF to hide financial transactions entirely unrelated to KWF. The first of these transactions occurred in March, 2012. On March 1, 2012, Reed, on behalf of KWF, signed a promissory note whereby KWF acknowledged receipt of a loan in the amount of $110,000 from Infinity Progress LLC, and agreed to repay the loan on or before August 31, 2015. The loan was secured by a mortgage on the Burns property. The mortgage was also signed by Reed. At trial, Reed was questioned by the Trustee about the transaction. The testimony was as follows:

Q. Did Keeper of the Word Foundation borrow $110,000 from Infinity Progress?

A. I borrowed the money from Mr. Swanson.

Q. You personally borrowed the money?

A. No, it was part of the Springfield property which was never paid to Mr. Swanson when he advanced the loan and all that was signed over to the Keeper of the Word Foundation.

10/15/15 Tr. at 24.

Q. . . . Who borrowed the $110,000?

A. That was money that were [sic] advanced to the development which Mr. Swanson had advanced as a loan. It has - -

28

Q. What development?

A. That was Springfield.

Q. Was the money paid over to Springfield?

A. No, it was not.

Q. Where was the $110,000 paid over to?

A. The money was - - the money was advanced in terms of as - - I was the general partner.

Q. Okay, I understand you were the general partner of Springfield. Who got the $110,000?

A. That was the development which I was in charge of.

Q. What was the name of that entity?

A. Equestrian Estates.

Q. And so Mr. Swanson lent money to Equestrian Estates?

A. That is correct.

10/15/15 Tr. at 25-26.

Reed's testimony as to how the $110,000 allegedly borrowed by KWF was used is murky.    What is crystal clear however, is that the funds were used for some other purpose than to benefit KWF.  By signing the note, Reed  saddled KWF with an obligation that had nothing to do with educational  mission of KWF.  The Court concludes that KWF's role in this transaction was to protect Reed from personal liability for nonpayment of a $110,000 loan.

Similarly, Reed used KWF to hide the proceeds he received from the settlement of the Barlan litigation.   Reed  negotiated the settlement on his own behalf: KWF was

29

not a party to the original contract with Barlan. The settlement agreement provided that the proceeds of the settlement were to be deposited in a KWF bank account, account ending in 7854. The bank statements for the two months following the deposit of the settlement proceeds show that Reed withdrew the settlement funds either to benefit himself or to pay preferred creditors such as the Infinity Group. The KWF bank account was simply used as a conduit to shield the settlement proceeds from the eyes of the Trustee, or the claims of Reed's creditors. (KWF Trial Ex. 1, Doc. 195-6,p.16-18.)

Neither Reed nor KWF dispute any of the facts set forth above. They argue however that there is insufficient evidence to prove that any property transferred to KWF was transferred with fraudulent intent, and therefore the only asset of value held by KWF, the Bagley Property, is property of KWF which cannot be recovered by the Trustee.

The Court agrees with Reed and KWF that there are no specific facts in the record that demonstrate that the 2011 transfer of the Bagley Property from Mic-Arian Corporation to KWF was a fraudulent transfer. The Court also agrees that procedurally, a fraudulent transfer action must be pursued by an adversary proceeding.[7] In his Motion for Turnover, however, the Trustee is not seeking recovery from KWF as the recipient of a fraudulent transfer. Instead the Trustee is arguing that Reed's failure to

---

[7]The Trustee filed an adversary proceeding against multiple parties, including KWF on February 27, 2015. (Adv. Pro. No. 15-4192). Counts I-IV seek recovery of various assets alleging that the assets were fraudulently transferred to entities related to Reed. The adversary proceeding has been stayed pending resolution of the Motion for Turnover.

segregate his personal affairs from those of KWF is grounds for treating property held by KWF as property of Reed's bankruptcy estate.

This Court finds that the facts support the relief requested by the Trustee. Reed's control of the finances of KWF made it possible for Reed to use KWF's bank accounts as his own. The income derived from either the sale of a document or from speaking and exhibit contracts flowed through KWF accounts directly to Reed. The value of payments received by Reed from KWF bank accounts far exceeds the $1500 per month owed Reed pursuant to his consulting contract with KWF. Essentially, Reed used KWF as his personal piggy bank.

Additional facts support the conclusion that Reed structured his financial affairs to insulate his income from the claims of creditors. Reed was employed by his law firm, GRA, but his compensation from the law firm was never deposited into a personal account. (11/2/2015 Tr. at 83). The Lexus which Debtor still drives was leased by the Scholarship Foundation and paid for by KWF. There are no records for KWF, GRA, or the Scholarship Foundation which separately account for the income and expenses of these entities from the income and expenses of Reed personally.

Reed has had a powerful incentive to keep his income and assets out of his own name and in the name of other entities. That incentive is avoiding the claims of creditors. Reed's schedule F shows unsecured debt in the amount of $571,153.02. Two-hundred thirty thousand ($230,000) of that debt is a non-dischargeable obligation to his ex-wife, Verladia Blount. That amount does not include a non-dischargeable obligation owed to Armen Balodian and Bridgeport Music, Inc. in the amount of $40,000 (See, Adv. Pro. No. 14-5223, Docket No. 35). Reed has used KWF and his other

31

entities to shield his income and personal assets from the claims of creditors. On these facts, it would be inequitable to find that any asset held by KWF is unavailable to satisfy the claims of creditors. This is particularly true with regards to the Bagley Property. Although the Bagley Property was transferred to KWF by the Mic-Arian Corporation, GRA was a 50% shareholder of Mic-Arian Corporation and Reed was the 100% shareholder of GRA. As with all his other assets, Reed had sole control of when and to whom his assets were transferred. (10/7/2015 Tr. at 31-32). The Bagley Property has no current value to KWF; it has been "parked" in KWF to protect it from the claims of creditors. If this asset is not treated as an asset of the bankruptcy estate, after the bankruptcy case is closed, the Bagley Property will most likely be sold by Reed. Based on Reed's past practices, the proceeds will flow through KWF to Reed, depriving his creditors of what appears to be his most valuable asset.

Reed has comingled his financial affairs with those of KWF to the point where Reed treats all of KWF's assets as his own. Therefore, the Court concludes that the assets of KWF, unless they are of inconsequential value to the estate, are property of Reed's bankruptcy estate, and must be turned over to the Chapter 7 Trustee.

III.

CONCLUSION

For the reasons set forth above, the Court GRANTS the Trustee's Motion for Turnover. The assets which are subject to the Order are:

32

(1)     the Burns Property;

(2)     the personal property located at the Burns Property, including, but not limited to, the property found by the Trustee on October 19, 2015 and any personal property which exceeds Reed's exemption for personal property;

(3)     the Malcolm X Papers;[8]

(4)     any interest Reed has in the Harbor Springs timeshare;

(5)     any other personal property purchased by Reed or KWF and located at the Burns Property or possessed by a third-party at some other location;

(6)     the $51,000 check made payable to the Infinity Group;

(7)     the 50% interest held by KWF in the Bagley Property; and

(8)     any personal property of KWF not found to be of inconsequential value to the bankruptcy estate.

Signed on December 17, 2015

                              /s/ Marci B. McIvor
                         Marci B. McIvor
                         United States Bankruptcy Judge

---

[8]It is unclear who is in possession of the Malcolm X Papers.  Reed testified that he transferred the papers to Richard Manson in 1996.  If and when the Papers are located, the Court will rule on whether any third party has a right to the Papers superior to that of the Trustee.

33